McCLASKEY et al. v. BARR et al.

(Circuit Court, W. D. Ohio, S. D. April 4, 1893.)

No. 3,984.

1. WITNESS—CREDIBILITY.

The testimony of a witness 77 years of age, as to an event in his boyhood of a nature to be vividly impressed upon his mind, is not discredited by the fact that his statements as to certain other events were confused, and somewhat contradictory, upon a long cross-examination, and his memory at fault as to dates.

2. EVIDENCE—INSCRIPTION ON TOMBSTONE—DATE OF DEATH.

An inscription on a tombstone, if sufficiently authenticated as genuine, and received as such by the family, is admissible, but not always credible, evidence of the date of death.

**3.** WILLS—CONSTRUCTION—AFTER-ACQUIRED PROPERTY—OHIO LAW.

Under the Ohio statute of wills of January 25, 1816, (2 Chase, St. 929,) and the act of March 23, 1840, (Swan, St. 992,) incorporated in a modified form into Rev. St. §§ 5914, 5969, a will making a general devise of all the testator's real estate speaks from the time of the testator's death, and passes after-acquired property, unless the contrary intention appears.

**4.** SAME.

A testator 82 years old—a widower, and childless—devised, "all and singular," his real estate to sons of his nephew, who had lived with and cared for him, and bequeathed his personal property to their sisters. *Held*, that his intent was to devise all after-acquired property, and that real property which came to him thereafter by a will, and from an estate of which he was ignorant when his own will was made, passed to his devisees.

**5.** SAME—PROBATE AND RECORD.

By the law of Ohio, since the year 1808, a will is not effectual to pass real estate unless it be probated, if domestic, or recorded, if foreign. 47 Fed. Rep. 154, 169, affirmed.

**6.** SAME—DESTRUCTION OF RECORDS—EVIDENCE.

The testimony of the clerk of a probate court, the record having been destroyed, that a certain will was admitted to record, should, in the absence of directly contradictory evidence, have greater weight than the omission of any record or statement of such entry in an unofficial local legal journal, published daily, and on which members of the bar generally relied as a trustworthy chronicle of orders, entries, and judgments.

**7.** SAME—ORDER TO RECORD.

Where the record of a will has been ordered, and every act done, except the writing of the record, the instrument should be considered as recorded. 47 Fed. Rep. 154, affirmed.

**8.** SAME—OHIO LAW—COURT OF COMMON PLEAS—JURISDICTION.

Under 1 Rev. St. Ohio, p. 141, § 535, providing for the certification of matters in which the probate judge is interested to the court of common pleas, and for the return of all papers to the probate court, upon the final decision of the questions involved in the proceedings, the court of common pleas, after having once heard a case, and certified the papers back to the probate court with an order that the disputed will be admitted to record, has no jurisdiction to set aside the order and recall the papers; the effect of such order being to make the will effectual to pass title, whether there had been any prior orders admitting it to record or not.

In Equity. On hearing upon the answer of Heberger's heirs to the cross bill of Samuel Barr et al.

For statement of the original case, see 47 Fed. Rep. 154.

H. T. Fay, for complainant.

Samuel T. Crawford, for cross complainant.

R. R. Harrison, Stephens, Lincoln & Smith, and Bateman & Harper, for respondents.

Before JACKSON, Circuit Judge, and SAGE, District Judge.

SAGE, District Judge. The defendants Michael Heberger et al., sole heirs at law of Francis Heberger, deceased, were brought into this cause as parties and coparceners after the interlocutory decree for partition was entered. They present to the court, for consideration de novo, the following questions, involving the rights of devisees under the will of Robert Barr, deceased:

1. When did the testator, Robert Barr, die? Mary Jane Barr—to whom the real estate, partition whereof is sought, descended from

William Barr, Sr. —— died November 27, 1821, and the estate then vested in the surviving brothers and sisters of William Barr, Sr., subject to the life estate, under his will, of Maria Barr. If the death of Robert Barr, who was a brother of William Barr, Sr., occurred prior to the death of Mary Jane Barr, his devisees, whatever may be the decision of other questions arising under his will, would not be entitled to any interest in said premises. The will of Robert Barr is dated February 16, 1821. It was proven before the register of Westmoreland county, Pa., October 21, 1822, by Samuel Morehead, one of the attesting witnesses, who also made affidavit that he saw Charles Baird, the other attesting witness, "who is since dead," sign it. Isaac Persching, born in Westmoreland county in 1800, testifies that he had no acquaintance with an old gentleman by the name of Barr, who lived on the Millwood Coal farm, but that he heard of his death, and that it occurred about a year after the death of Maj. Wilson, whose funeral witness attended, and that occurred in 1821. He testified, also, that the Barr to whom he referred was buried at Salem church, and that at the time of his death he resided with the Barr family out on the Coal farm, where Samuel Barr and his brother and sisters resided, and where a Barr family had lived since 1805,—the only family of that name in Derry township, although prior to that date there were two other Barr families living at other localities in that township. The witness testifies that, although his first acquaintance with any of the Barr family began in 1844, he went to the Barr farm to get peaches when he was only 5 years old, and that when he was 14 or 15 years old he heard of old Mr. Barr. Robert Barr's testimony is that he was born July 6, 1807, in Derry township, Westmoreland county, Pa., and that he knew his great-uncle, Robert Barr, the testator, from his earliest childhood, and lived in the next house, only about three feet from the house where his great-uncle lived, until the time of his death, which occurred in September, 1822. It appears, however, that he had, three or four years before giving his deposition, made an affidavit in which he stated that the date of Robert Barr's death was September, 1821, and later, in his cross-examination, testified that he died in 1852, instead of 1822, and that he fixed the date from having seen a certified copy of the will. He was 77 years of age when he gave his deposition, and his testimony as to dates, in addition to being inferential, is so uncertain and varied that it must be disregarded. But he details one circumstance with the clearness and exactness which often characterizes the statements of those advanced in years in reference to events of their early life, and that is that the will was probated, and admitted to record; that he was present when the executor took it from the house; that he saw his eldest sister get it; that he saw it, and saw her hand it to the executor at the gate, but was not present in court when it was admitted to probate. His testimony on this point is, further, that the will was sealed up,—he did not know by whom; that it was sealed up the first time he ever saw it, and indorsed as the will of Robert Barr,

and that it could not have been over one month after the death of Robert Barr that the will was taken out of his house, and given to the executor; that it was at the first term of the orphans' court after his death. It is not strange, nor does it discredit him, that the witness, seven years past three score and ten, was, in the course of a cross-examination drawn out to 502 questions, confused and contradictory, and that his memory was at fault as to dates, which do not so much impress themselves upon the young. Nor is it strange that the incident of his boyhood, of the delivery of the will to the executor, so coupled in his mind with the then recent death of his great-uncle as to be of special significance in fixing the time, should abide in his memory in his old age.

Samuel Barr, born in Derry township in 1811, and resident there all his life, testifies that Robert Barr died in 1822 or 1823. The inscription on his tombstone states September 15, 1823, as the date of his death. The question in dispute relates only to the date. As to the inscription on the tombstone, it falls within the general rule that monumental inscriptions, if sufficiently authenticated as genuine, and as having been received as such by the family, are regarded as admissible, but not always as credible, evidence. Pow. Ev. (3d Ed.) pp. 147, 150; Davies v. Lowndes, 6 Man. & G. 527. In Haslam v. Cron, 19 W. R. 969, Bacon, V. C., states the rule thus:

"In the case of tombstones, no doubt the publicity of the inscription gives a sort of authenticity to it, and, if it remains uncontradicted for a great many years, it would, in the absence of every other fact in the case, be taken to be true; but you cannot put it higher than that."

It appears from the record that Robert Barr was the owner of 104 acres, on which he lived and died, and that his will, devising it to his nephews, was proven on the 21st day of October, 1822. It does not appear that that probate has ever been challenged. Putting aside the inscription on his tombstone of the date of his death, as manifestly erroneous,—as it is conceded to be by counsel on all sides,—and adding to the other evidence cited, in substance, above, the presumption, strongly corroborated by, and corroborative of, the evidence of the witness Robert Barr, that the probate of a will devising a landed estate to collateral kinsmen would not have been long delayed after the testator's death, our conclusion is that it is established by a clear preponderance of the evidence that Robert Barr died in 1822, probably in September.

2. Did his will, even if it be found to have been admitted to record according to law in Hamilton county, Ohio, pass any interest or estate in the lands sought to be partitioned herein? It was executed on the 16th day of February, 1821. The following is a copy:

"In the name of God, amen. I, Robert Barr, of the township of Derry, in the county of Westmoreland, and state of Pennsylvania, being in a tolerable state of health, and of sound mind and memory, yet calling to mind the mortality of my body, and that it is appointed for all men once to die; do this sixteenth day of February, in the year of our Lord one thousand eight hundred and twenty-one, make, ordain, and leave this as my last will and testament, which is as follows, viz.:

"First, and above all, I will and bequeath my soul to God, who gave it, and my body to dust, from whence it came, to be decently interred at the discretion of my executor. And as touching what worldly things God, in his providence, has been pleased to bestow upon me, I do hereby will and dispose of them in manner following, viz.:

"To John, Robert, and Samuel Barr, children and heirs at law of my nephew William Barr, deceased, I will and bequeath, all and singular, my real estate; and to John I will and bequeath my armchair and table and table-cloth and pots. And all my other movable property I will and bequeath to Martha and Jane Barr, children of the aforesaid William Barr, to be equally divided between them."

So far as this relates to or affects realty in Ohio, it was necessary that it should be executed in accordance with, and it must be construed by, the laws of that state. The statute of wills, of January 25, 1816, (2 Chase, St. 929,) was then in force. The first section empowered every adult person, of sound mind, to devise, by last will and testament, in writing, "all the estate, right, title, and interest in possession, reversion, or remainder, which he or she hath, or at the time of his or her death shall have, of, in, or to lands, tenements, hereditaments, annuities, or rents charged upon or issuing out of them; also, all goods and chattels,"—"so as such last will and testament be signed by the testator, or some person for him or her, in his or her presence, and by his or her direction, and at the same time be attested by two or more credible disinterested witnesses subscribing their names in his or her presence."

The language of this section is identical with that of the first section of the wills and administration acts of February 18, 1808, (1 Chase, 571,) and February 10, 1810, (1 Chase, 680.) The act of January 25, 1816, cited above as the act in force when Robert Barr's will was executed, was repealed by the act of February 11, 1824, defining the duties of executors and administrators, (2 Chase, 1308,) and on the 26th of February, 1824, an act relating to wills was passed, which empowered any person having any estate in any lands, tenements, or hereditaments to give or devise the same to any person by last will and testament, (2 Chase, 1305.) This provision limited the power of a testator to devise real estate to that which he had at the date of the will. It continued to be the law until the act of March 23, 1840, (Swan, St. 992,) the first section of which gives to any person of full age, and sound mind and memory, the power to give and devise any interest which he or she may have in any lands, tenements, or any annuity or rents charged upon or issuing out of the same; and section 48 provides that any estate, right, or interest in lands or personal estate, or other property acquired by the testator after the making of his will, shall pass thereby in like manner as if held or possessed at the time of making the will, if such shall clearly and manifestly appear by the will to have been the intention of the testator. This remained in force until the adoption of the Revised Statutes, which modified it only in form, as follows:

"Sec. 5914. Any person of full age, and of sound mind and memory, and not under any restraint, having any property, personal or real, or any interest therein, may give and bequeath the same to any person by last will and testament lawfully executed."

"Sec. 5969. Any estate, right, or interest in lands or personal estate, or other property acquired by the testator after the making of his will, shall pass thereby in like manner as if held or passed at the time of making the will, if such shall clearly and manifestly appear by the will to have been the intention of the testator."

These sections are now the law.

From this review it appears that from 1805 to 1824 the statute law of Ohio was as at the date of Robert Barr's will; that from 1824 to 1840 there was no provision for disposing by will of lands subsequently acquired; and that since 1840 after-acquired lands pass by will, if .it clearly and manifestly appear by the will that such was the testator's intention. The provision of the first section of the act of January 25, 1816, as to after-acquired property, in force when the will of Robert Barr was executed, was taken, word for word, from the Virginia statute of wills of the 1st of January, 1787, which was under consideration in the court of appeals of that state in Allen v. Harrison, (decided at the October term, 1802,) 3 Call, 251. The testator, in that case, devised to his son John and his heirs all his lands in the counties of Surry and Sussex, and to his son William all his lands in the counties of New Kent, Southhampton, and Nansemond, and in James City. He also gave a plantation on the three creeks to his son John, and his plantation called the "Fort Quarter" to his son William. "All the rest and residue" of his estate, "of what nature or kind soever," he gave to his said two sons, to be equally divided between them. It was held that after-acquired real estate did not pass by the will. Pendleton, P., in his opinion, said:

"If the legislature had intended to abolish, wholly, the distinction in England, they would certainly have declared that every testator should be considered as speaking in his will, at the time of his death, as well respecting his real as his personal estate, and thus have put an end to all controversy about it, instead of which, they have only varied the rule as to lands, sub modo; that is, by giving testators a power which they may exercise or not, at their will and pleasure, to dispose of their after-purchased lands; meaning, as it appears to me, to meet the desire in Bockenham's Case, [Gilb. Dev. 138,] where a man shall devise all the lands which he shall have at his death, but not further interfering with the rule."

In Bockenham's Case, there was a devise of all the lands the testator then had, or should have at his death; but after-acquired real estate was, under the English rule, excluded from. the operation of the will. Smith v. Edrington, 8 Cranch, 66, was a case arising under the same statute. The testator expressed his desire that all his just debts should be paid by his executors, who were authorized to dispose of and convey his property, so far as might be necessary for that purpose, and then followed this provision:

"Should my son William P. Edrington, to whom I bequeath the whole of my property, after the payment of my debts and provisions above made, die under the age of twenty-one years, I then give," etc.

The testator then made certain pecuniary bequests in the event of his son's so dying, and concluded by disposing of the then residue of his property. The supreme court held that after-acquired property did not pass under the will. Justice Washington, announ-

cing the opinion, said, after quoting the provision of the statute, that it was necessary that the intention to make a disposition of after-purchased lands should clearly appear upon the face of the will; that the presumption was that the testator meant to confine his devises to land to which he was then entitled, and this presumption could only be overruled by words clearly showing a contrary intention. He held, further, that in that will were no expressions which indicated an intention to devise, or in any manner to charge, lands which the testator might afterwards acquire; that it did not appear that he contemplated, when he made his will, the purchase of any land, and the words "estate" and "property," to be found in it, might be fully satisfied by applying them to the personal property of which he was possessed. The statute of Virginia, above cited, was adopted in Kentucky, and in Warner's Ex'rs v. Swearingen, 6 Dana, 195, the court of appeals of Kentucky held that, prima facie, the testator contemplated only such interests as he owned when he published his will, but that, if he manifested an intention to devise what interests he might own at his death, then, and only then, his will should be understood as speaking at his death as to land, as well as any other property, but that such an intention would not be presumed, but must be disclosed by the actual import of the provisions of the will. In the will before the court in that case the testator directed the division, among persons named, of the "residue of the estate," which the court held did not evince any reference to lands subsequently acquired. In Dennis v. Warder, 3 B. Mon. 173, the testator declared his purpose to dispose by will of such estate as it had pleased God to bless him with. The court held that the will passed only such real estate as the testator owned at the date of its publication, and that it indicated no intention to devise all the estate he might own at his death. In Marshall's Heirs v. Porter, 10 B. Mon. 2, the court held that the mere fact that the testator, by his will, made a general disposition of his land, or of all his estate, would not authorize a deduction that he intended to include real estate afterwards acquired. In that case the testator declared his purpose to dispose by will of such "worldly estate as it hath pleased the Almighty to bless him with."

The statute of Ohio now in force, relating to wills, was adopted from a statute of Massachusetts. It differs from the statute of 1816 only in the express provision that the intention to pass subsequently acquired real or personal estate must clearly and manifestly appear by the will itself. That provision, however, only incorporated into the statute a rule of construction which would have been applied, as indicated by the opinion of Justice Washington in Smith v. Edrington, in the absence of the express provision. But we will now refer to the cases in Massachusetts. In Blaney v. Blaney, 1 Cush. 116, the court was of opinion that, since the enactment of the statute, testators could devise after-acquired lands by clearly manifesting by their wills their intention so to do. The court said that, on inspecting the will under which the plaintiff claimed, they could not doubt the testator's intention to give him all the property not disposed of by the will, and that he manifestly had in mind the

subsequent acquisition of real estate, as indicated by a provision for his widow in lieu of dower in the real estate of which he might "die seised;" and, after devising and bequeathing to plaintiff all the rest, residue, and remainder of his said property and effects, of every description, real, personal, and mixed, not before disposed of, authorized his executor to sell and dispose of any or all the real estate not specifically devised, of which he might "die seised." This case, therefore, recognizes that the intent to include after-acquired property in the operation of the will must appear upon the face of the will.

In Brimmer v. Sohier, 1 Cush. 133, after sundry legacies, the testatrix devised and bequeathed a moiety of all the residue of the estate to her sister for life, and all the residue of the estate to her brothers, in case they both survived her, otherwise to the brother who should survive her. The court said that the arrangements made by the testatrix were therefore prospective, looking forward to an event which might not happen until many years after her decease. In this connection the court referred to the concluding paragraphs as specially significant, calling attention to the fact that the estate was given to the brothers in case they should both survive the testatrix; "otherwise, my will is that the brother who shall survive me shall take the whole and entire of my estate," which the court said was language as comprehensive and emphatic as could well be used, and clearly intended to embrace the residue of all the estate which the testatrix should leave at the time of her death; and that, in contemplating the event of survivorship, the mind of the testatrix was carried forward to a state of things which would exist at the period of her decease, and that it was with a reference to that period that the disposition of her whole property was made. It was the opinion of the court upon these considerations that the testatrix did not intend to die intestate as to any part of the estate which she might leave, and that the after-acquired real estate did pass by her will to the surviving devisee.

In Prescott v. Prescott, 7 Metc. (Mass.) 141, the court said that the provisions which is adopted in section 5969 of the Revised Statutes of Ohio seemed to remove the distinction between real and personal estate, "so that now all legacies and devises passed to the residuary legatee." That, however, was obiter, for the court proceeded to say that the point was not material in the case, as the testator, after the making of his will, and before the making of the codicil, had sold his real estate, and it was not stated that he had died seised of any real estate.

The court, in Cushing v. Aylwin, 12 Metc. (Mass.) 169, had before it a will which was made prior to the Revised Statutes, and the land demanded was purchased by the testatrix afterwards. It was held that the provision of the statute applied as well to wills made before as to those made after the statute, when the will had not before that time taken effect by the death of the testator. The will bequeathed to William C. Aylwin and Charles C. Payne, and the survivor of them, his executors and administrators, all testatrix's property, including certain trust property, in trust, with power to

the executors to invest from time to time, and to alter, change, and reinvest the same, and to pay over the income as specified in the will. The court said: "We think it is generally true that when a will purports to dispose of the testator's whole estate or property the intention is to dispose of all the estate or property of which the testator may be the owner at the time of his death; and that such intent would be inferred, unless something in the will should be opposed to such an inference." And the court found that there was nothing opposed to such an inference in the will in that case; that it was manifestly the intention of the testatrix to give her whole property to her nephew and his children, and that he should have only the income; and that at his death the property should be divided among his children, and for this purpose the property was given to trustees. "It was manifest, therefore," added the court, "that the testatrix did not intend to die intestate as to any part of her property."

In Winchester v. Forster, 3 Cush. 366, the testator declared in his will his wish to secure for the use of his wife the dwelling house which they then occupied, and to furnish an income adequate to all her wants. He therefore provided that if he was not the owner of that house at the time of his decease it should be purchased at a price not beyond a limit fixed, and that his wife should hold and enjoy it for or during her natural life. If that house could not be obtained within the limit, then he directed that any other in the city of Boston, which should be selected by his wife, and which could be bought at or below the limit, should be purchased, and that his wife should hold the same for life. He also gave to her all the household furniture, silver plate, and family stores, and the net income of one third of his personal estate during her life or widowhood. After providing a legacy for his brother and his daughter, he gave at the decease or intermarriage of his wife the income of that part of his estate which he appropriated to her use unto his daughter for her life, and in case her husband survived her he was to have the income during his life. He also gave the income and produce of all the residue of his estate to his daughter and her husband for life, and provided that her child or children who should survive the parents should take and have, share and share alike, of his estate, real, personal, and mixed, subject to the provision made for their grandmother, testator's wife, should she then be living. Finally he provided that if his daughter should die without issue surviving her, or, leaving issue, such issue should die in minority and unmarried, all his estate, real, personal, and mixed, should go to such person or persons as would then be his heirs at law in case he had died intestate and without issue. Chief Justice Shaw, in pronouncing the opinion of the court, said that in one respect the will disclosed a clear intention to pass after-acquired estate. That was by the provision relating to the house in which the testator then lived, and the directions that it should be purchased for the use of his wife, and held by her for life. But he announced that the more decisive consideration was that it appeared by the whole scheme and tenor of the will that the testator

intended to make a full and entire disposition of his whole property, real and personal, and therefore the court was of opinion that it did "manifestly appear to have been the intention of the testator to make a testamentary disposition of all the estate he should leave at the time of his decease, and that the after-acquired estate did pass by the will." It is to be noted that there was in that case no express declaration of any such intention, nor was there in Cushing v. Aylwin.

Wait v. Belding, 24 Pick. 129, decides questions arising under a will executed in 1797, before the Revised Statutes, which devised to the testator's two sons, designated, and their heirs, "the whole" of his "lands and buildings lying and being in the town of Hatfield." By a codicil dated May 2, 1812, he gave to the same sons, without adding "and to their heirs," lands not enumerated in the original will, but purchased since then in the town of Hatfield or elsewhere, and declared that his will and meaning was that his codicil should be annexed to and made part of his will to all intents and purposes. After the execution of the will, but before the execution of the codicil, the testator purchased the premises which were demanded in the suit by a third son. The question was whether the two sons took, under the original will, in connection with the codicil, an estate in fee or for life only in the premises demanded, the rule of law recognized in Massachusetts being that in a devise of real estate without limiting it to the devisee and his heirs, a life estate only is devised, unless it appears elsewhere in the will that the testator intended to give the estate in fee. Chief Justice Shaw, on page 136, says:

"In general, a will looks to the future. It has no operation, either on real or personal property, till the death of the testator. General words, therefore, may as well include what the testator expects to acquire, as what he then actually holds. The term 'all my property' may as well include all which may be his at his decease as all which is his at the date of the will, and will be construed to be so intended, unless there are words in the description which limit and restrain it. We are then brought back to the particular description, 'the whole of my lands and buildings lying and being in the town of Hatfield.' There are certainly no words, and nothing in the will, showing an intent to limit it to the lands and buildings then held by him. No such intent can be presumed."

And on page 137 he says that, if the will had been made after the Revised Statutes, there seemed to be no doubt that the after-acquired estate would have passed by the devise, the description being general, of all lands in Hatfield, without limitation as to the time of acquisition, and, if that description was sufficient to include all real estate in Hatfield, the after-acquired premises would have passed but for the rule of law then in force restraining the operation of all devises to real estate held by the testator at the date of the devise. These statements are apart from the decision of the point involved in the case, but they are of importance as showing what was understood to be the law with regard to the construction of the intent of the testator to be derived from a devise of all his estate within a certain town, or of all his estate.

We have in the above-cited cases two lines, in contrary directions,

of decisions upon statutes of the same import; the decisions in Virginia and in Kentucky holding that a devise of the whole estate, or of the entire estate, or of all the lands of the testator, or of all the lands "which it hath pleased God to give" to the testator, does not indicate an intention that the will shall include after-acquired property; while the decisions in Massachusetts are that a devise of "all my property," or of all the estate, will be construed to be intended to include all which might be the testator's at his decease, unless there are words in the description which limit and restrain it. The decision in Smith v. Edrington by the supreme court, hereinbefore cited, would be authoritative and decisive but for the consideration that it rests upon the construction by the court of a Virginia statute which was also a rule of property, and the construction of which by the court of appeals of Virginia was a rule of decision for the federal courts. Which line of decisions, then, shall this court follow? Before deciding, we must look into the decisions by the supreme court of Ohio for what light they may throw upon the question, for the will of Robert Barr, as has hereinbefore been stated, so far as it relates to or affects the title to lands in Ohio, must be construed according to the law of Ohio.

The first case is Lessee of Smith v. Jones, 4 Ohio, 116, decided at the December term, 1829. The defendants claimed under a will dated July 25, 1811, and gave in evidence that the testator, Smith, was in possession of the lot involved in the suit, which was in ejectment, under a verbal contract of purchase, and commenced improvements upon it prior to the date of the will. On the 9th of September, 1811,—some six weeks after the date of the will,—the testator entered into a written agreement with the owner for the purchase of the lot, in completion of which a deed was made on the 26th of May, 1812. The court below instructed the jury that if they were satisfied from the proof that the testator was in possession under a verbal contract of purchase at the time of making the will, the devise was operative, and the defendant entitled to a verdict. The jury so found, and the case was before the supreme court on assignments of error in the instructions. In the course of the decision, which sustained the instruction, the court said that it was a prominent feature of English law to favor the heir and prevent disinherison, and that that had introduced the fixed principle that at the inception of the will a man must be seised of the estate devised. But the court went on to say that the difference in circumstances had in Ohio led to a difference in legislation, and that cases might arise "in which our courts may with great propriety depart in their judicial decisions from those of England upon questions arising out of wills. The laws of the various states show that it is the general policy of the government that estates should not accumulate in families, or succeed in perpetuity. This is universally supposed to be the most effectual way to guard from degeneracy and destruction our free and equal institutions." After holding that a devise in general words will carry the estate both in law and equity, and that when an equity existed at the time of publishing the will, and before the testator's death it was carried

into grant, the equitable and legal estate could not be parted, but the latter attached to the former, so as to vest a complete estate in the devisee, the court confirmed the judgment below. This case is important as indicating that the English rules of decision upon questions arising out of wills were not regarded as binding upon the courts of Ohio.

Allen v. Little, 5 Ohio, 66, was not a will case, but it decided that under the statute of Ohio a married woman could make a will devising real estate held in her own right. The argument to the contrary was that the several statutes of Ohio were not materially variant from the statute of wills of Henry VIII., and that under that statute it was held that a married woman could not make a valid will. The opinion of the court was by Judge Hitchcock, one of the strongest, if not the strongest, of the old judges. After referring to the fact that at common law real estate could not pass by will, and that all the decisions made by English courts upon the statutes of wills enacted in the reign of Henry VIII. had been made with reference to those statutes, and were uniform in denying the right of femes covert to devise real estate, he says:

"English cases can be of no authority here, unless it be first shown that the statutes under which those cases were decided are similar to our own. It cannot, however, be matter of surprise that among the profession the opinion should prevail that even in our state a feme covert cannot make a will. We get our ideas from reading English law books, and the books of reports published in our sister states; and, without stopping to inquire what change has been made by our own local legislation, we adopt, as sound law, the principles there advanced."

Then he refers to decisions by courts of other states, and, passing to an historical review of the legislation in Ohio, and to the consideration of the statute then in force, which included "every female person aged eighteen years and upward, being of sound mind," among those who might devise real estate, he asks what is meant by the phrase "Every female person aged eighteen years and upward," and then proceeds as follows:

"I do not ask those alone who have derived their ideas of the propriety of any law by reading English books, or who would enlarge or restrain a statute of Ohio, so as to make it compare with a statute upon the same subject, although with different phraseology, enacted in New England, New York, Massachusetts, Pennsylvania, or any other state in the Union, but I ask any man of ordinary common sense, who desires to arrive at a correct understanding of a statute, by giving to the words used by the legislature their ordinary and appropriate meaning. The law is made, not for the benefit of this or that profession or class of men, but for the community at large; and every statute should receive such construction as is consistent with the common sense of that community."

The court, in Kerwhaker v. Railroad Co., 3 Ohio St. 172, called attention to the fact that early in the history of Ohio the common law of England and the statutes of that country of a general nature in aid of common law, passed prior to the fourth year of King James I., were adopted by legislative enactment; but that act was repealed on the 2d of January, 1806, since which time, the common law of England has had no force in Ohio derived from legislative adoption. The court proceeded to say that common law has con-

tinued to be recognized as the rule of decision in our courts in the absence of legislative enactments, so far as its rules and principles appeared to be based on sound reason, and applicable to our condition and circumstances, and therefore it has no force in Ohio, except so far as it derives authority from judicial recognition in the practice and course of adjudication in our courts, and this extends no further than it illustrates and explains the rules of right and justice as applicable to the circumstances and institutions of the people of the state; and the court accordingly held that the rule of the common law requiring the owners of domestic animals to keep them on their own lands or within inclosures had never been in force in Ohio. The statute making the common law of England and all the statutes of a general nature in aid of the common law prior to the fourth year of the reign of King James I. the rule of decision was adopted by the governor and judges of the territory northwest of the Ohio river, and published July 14, 1795, to take effect October 1, 1795. 1 Chase, 190. It was a contested question, upon which the judges in Thompson's Lessee v. Gibson, 2 Ohio, 340, were equally divided, whether the adoption had any binding force. The fifth section of the ordinance of 1787 for the government of the territory northwest of the River Ohio required that the adopted law should be a law of one of the original states, and the law in question was not, either at the time of its first enactment or at the time of its adoption by the governor and judges, a law of an original state. Its first enactment was in May, 1776, by the legislature of the colony of Virginia, and, when adopted by the governor and judges, it had ceased to be a law of that state, having been repealed, so far as it enforced the English statutes, by the act of December 27, 1792, (Tate, Dig. 21, 89.) It was argued that, if the Virginia law was not in force, the governor and judges had no authority to adopt it. "Their authority was to adopt laws,—not the dead forms of statutes, from which the vital energy had departed." 1 Chase, 190, note. The argument on the other hand was that no great weight was due to the circumstances that the Virginia law was first enacted by the colonial legislature, and that, since the repeal was only so far as the law enforced the English statute, the adoption was good pro tanto, and was effectual to make the common law of England a rule of decision in the territory.

In Sergeant v. Steinberger, 2 Ohio, 306, the supreme court held, remarking that it had been more than once decided by the supreme court on the circuit, that estates in joint tenancy did not exist in Ohio, and such has ever since been recognized as the law. The court said that the reasons which gave rise to that description of estate in England never existed here: that the jus accrescendi was not found in principles of natural justice, nor in any reasons of policy applicable to our society or institutions, but, on the contrary, was adverse to the understanding, habits, and feelings of the people.

In Helfenstine v. Garrard, 7 Ohio, 275, the court was united in opinion that the statute of uses, if ever in force in Ohio, became so by the statute of 1795 or 1805, and was repealed by the statute of 1806, above cited, which was before the date of the patent for

lands involved in that case. Judge Lane, pronouncing the opinion, said that after a political organization, and the administration of justice by courts within the state of Ohio for the period of 48 years, the court found no traces of authority of the statute of uses at that time as a rule of property, and that our system of conveyancing, although it had grown out of the English system, did not depend upon the statute of uses, but had taken its form and derived its authority from our own statutes and local usages. It is plainly apparent that the court was not inclined to recognize that the statute had ever been in force in Ohio.

The will in Reynolds v. Shirley, 7 Ohio, 323, was executed on the 18th of December, 1824, which was while the wills act of 1824 was in force. It contained a devise by Abiathar Shirley to his wife of certain specific real estate, and added this general clause, "all my other freehold estate whatsoever." The real estate in controversy was acquired after the execution of the will. Shirley died in 1834. In his last illness, sitting on his bed, with his will in his hand, he said to the witness, who testified that he was there in response to Shirley's request: "This is my will. It was signed and witnessed in 1824, and I have called you to witness it as my last will and testament." Thereupon, by Shirley's request, the witness indorsed on the will the following certificate: "This is to certify that 'the within is, as therein declared, my last will and testament, acknowledged before those whose names are heretofore subscribed this 23rd August, 1834;" and it was read to Shirley, who said that his name was already to the will, and requested the witness and another person who was present to sign it, and they did so. The witness testified that Shirley was of sound mind at that time. It was argued for the plaintiffs that the republication of a will must be in writing, executed with all the solemnities required in the execution of the original will. The court, however, was satisfied that there was a complete re-execution of the will, and that the will thus republished spoke as to and disposed of the real estate owned by the testator in 1834.

The decision in Pruden v. Pruden, 14 Ohio St. 251, was announced by Judge Ranney. The petition was filed to obtain a construction of the will of the testator. After providing for the payment of his debts and funeral expenses, and giving two small legacies to charitable uses, he gave and devised to his wife, in case she should survive him, all his moneys, credits, personal and real estate, and property, for her benefit and support during the term of her natural life. In the event of his wife not surviving him, his whole estate, real and personal, was to descend as directed by law, and as if the will had not been made. In case his wife should survive him, all his estate and property, real and personal, above devised, that at his wife's decease should remain, was to go to his heirs, and their legal heirs, forever. He further directed his executor to sell, in his discretion, a 40-acre tract described in the will, and to collect the amount due him from his son Charles. He authorized his executor, whenever his wife should desire it, to sell the house in which he lived and the lot on which it was built, and pay over all

the moneys realized from the sale of his real and personal estate to his wife. On behalf of the heirs it was claimed that the fund arising from the sale was not disposed of by the will. In overruling that claim the court referred to the provision in the statute of wills that after-acquired property shall pass "if such shall clearly and manifestly appear by the will to have been the intention of the testator." Judge Ranney then says:

"For the reasons given in Lessee of Smith v. Jones, 4 Ohio, 121, a will should probably be construed with somewhat more liberality here, upon a question of this character, than has been customary in the English courts. It very seldom happens that a man who goes to the trouble of making a will intends to die intestate as to any of the property that he may own at the time of his death; and when it clearly appears that the testator intends all the property he owns at his death to be used and applied for specified purposes, and the changes between the will and his death have simply consisted in converting it from one description of property into another, there can be no danger of interfering with his intentions by holding it all subservient to the accomplishments of such purposes. Indeed, every line of this will looks to his death, and the situation of his property at that time, as the starting point in his dispositions. It is then that his debts are to be paid, and it is then that his wife is to take, either for life or otherwise, all the residue of his 'personal and real estate, and property,' of every description; or, if she is not then living, that it is all to go to his heirs, as though the 'will has not been made.'"

As strongly indicating the disposition of the supreme court of Ohio to discard English rules for the construction of wills not in harmony with the changed conditions and circumstances in Ohio, the case of Parish's Heirs v. Ferris, 6 Ohio St. 563, may be referred to, where the court held that if A. "die without issue," or "without heirs," or "without children," then the devise should be to B. in fee. The words "if he die without issue" or words of similar import are to be interpreted contrary to the English rule, and according to their popular and natural meaning; that is, as referring to the time of the death of A., unless the contrary intention is plainly expressed in the will, or is necessary to carry out its undoubted purposes. To emphasize the departure, the court said it might have reached the same conclusion without impeaching the old English rule of interpretation, but that they were unwilling to make an exception by which they would sanction the English construction of the words under consideration, and at the same time make the case before them an exception to a rule which they said never had been recognized, and that the uniform course of the decisions of the courts of this state had been to so construe wills as to carry into effect the intention of the testator, while to adopt the English rule would clearly defeat that intention. The court cite Daniel v. Thompson, 14 B. Mon. 562, where the English rule was rejected as one unknown to the community, contrary to the natural sense and common use of words, and founded upon lands and estates inapplicable to titles in Kentucky; and they quote the language of Justice Hitchcock:

"I must be permitted to say that these rules, in most cases, are applicable, not for the purpose of ascertaining, but of defeating, the intention of the devisor; and I presume no such statute [referring to the statute of entailments] would have been passed had it not been supposed that these antiquated rules of construction were too much regarded by our courts."

Parish's Heirs v. Ferris was affirmed in Niles v. Gray, 12 Ohio St., where, on page 327, will be found quite as vigorous a repudiation of English rules of construction which had been discarded by statute in England, as the statutes of Henry VIII., relating to wills, upon which the authorities in Virginia and Kentucky cited above in this opinion really rest, have also been discarded.

In Gillen v. Kimball, 34 Ohio St. 360, Judge Boynton, announcing the opinion of the court, says:

"Where a will is executed, making a disposition of property of the testator, both real and personal, a presumption arises that he intended thereby to dispose of his whole estate, unless the contrary appears."

There is not in the Ohio Reports a single case in which the precise question before us for decision was passed upon or even presented. This fact of itself warrants the inference that, by the common understanding of the people and the lawyers of the state from the beginning, a devise, in general terms, as "all the estate," or by any other general terms, has been sufficient to pass after-acquired lands. We do find that since 1806 the common law of England has had no force in Ohio derived from legislative adoption, and has been recognized by the courts no further than it illustrates and explains the rules of right and justice as applicable to the circumstances and institutions of the people of the state. We find, too, that as early as 1831 the supreme court, declaring that the common law rule to the contrary had no force, decided that a married woman might dispose of her property by will as if she were a feme sole; and that repeatedly the same court has said that in reference to after-acquired realty, a will should be construed more liberally than has been customary in the English courts; for, as a very able judge expressed it, "it very seldom happens that a man who goes to the trouble of making a will intends to die intestate as to any of the property that he may own at the time of his death." We find, further, that the same court has put the stamp of its special disapproval upon the English rule of construction of "dying without issue" and expressions of like import, and has said that where a will makes a disposition of property, both real and personal, the presumption is that the testator intended thereby to dispose of his whole estate, unless the contrary appears,—a presumption expressly approved by the supreme court of the United States in Given v. Hilton, 95 U. S. 594, quoting from Vernon v. Vernon, 53 N. Y. 351, that the law prefers a construction which will prevent a partial intestacy to one that will permit it, if such a construction may reasonably be given. Thus we see that the trend of the decisions by the highest court of the state of Ohio is away from English statutes and rules and authorities as to the interpretation and construction of wills, and in favor of a construction more liberal, and more in harmony with the institutions and government of the state and the circumstances of its people. Turning to Virginia, we see that in Harrison v. Allen, supra, the act of which the Ohio statute of wills of 1816 is a copy is treated as only a modification of the English statutes of wills, which were until then fully in force in that state, and that the same view

is expressed in Smith v. Edrington, supra; while in Browne v. Turberville, 2 Call, 404, it is declared that "in Virginia all agree that the common law of England is the general law of the land, where it is not taken away by the statute of the state." In Massachusetts the English statutes of wills never were recognized, after colonial times, as in force.

Right here attention may be called to the fact that even the English courts have not questioned that where a testator devised all his real estate he intended to include all he might have at his death. That was always understood to be the effect of a bequest of all the testator's personal estate, and in Wind v. Jekyl, 1 P. Wms. 575, Lord Macclesfield observed that "the intention of the party must have been the same as to both" his real and personal estate. Under the old law, where a testator made a general gift of his real and personal estate, he was considered as meaning to dispose of both "to the full extent of his capacity," but in regard to the real estate the will was read as a gift of what belonged to him at the date of its execution, not because it did not evidence an intention to devise after-acquired estate, but because he was incapable of devising what did not belong to him at the date of his will. 1 Jarm. Wills, *326. It would seem to follow logically that if the power to devise after-acquired realty was conferred by statute, provided such intent was manifest from the will, a general devise would, of itself, sufficiently evidence the intent. Accordingly, in Hayes on Conveyancing, (5th Ed., p. 591,) the opinion is expressed that a general devise of real estate would carry after-acquired lands "almost of course from the extension of the disposing power to all the real estate belonging to the testator at his decease."

We are not inclined to follow the decisions of Virginia, nor those of Kentucky, which are in the same direction. The decisions by the supreme court of Massachusetts are more in the line of those of the supreme court of Ohio. Under the statute of Ohio in force at the date of Robert Barr's will the question turns upon the intention of the testator. Chief Justice Robertson, in Walton's Heirs v. Walton's Ex'x, 7 J. J. Marsh. 58, said that, under the Kentucky statute, (which, as has been hereinbefore stated, was an adoption of the statute of Virginia from which the Ohio statute was copied,) whether after-acquired lands could pass by the will or descend to the heirs was a question of intention to be solved by a proper construction of the whole will; and that, if from the will itself it appeared more reasonable to infer an intention that after-acquired land should pass by it than that it should remain undevised, then it would pass. If the contrary intention should seem more reasonable, the land would descend. In Starling v. Price, 16 Ohio St. 31, the court said that the intention was to be gathered, "not necessarily alone from the phraseology of the particular clause to be construed, but from the whole will, including the codicils, if any, and all these, viewed in the light cast upon them by the relations and circumstances of the testator, of his estate, and of the objects of his bounty;" and that, "in searching for such intention, courts ought not to permit themselves to be enslaved by mere technical rules of

construction." The same rule is stated in Banning v. Banning, 12 Ohio St. 456, where the court say also: "It is a rule of judicial policy in England to lean in favor of the heir as against the devisee; but such is not the policy in Ohio." To the same effect see Moore v. Beckwith, 14 Ohio St. 132, and Thompson v. Thompson, 4 Ohio St. 351, where Judge Thurman said that "of all the instruments that need the benefit of a liberal construction—a construction that prefers substance to mere form—wills need it most."

Now let us take up the will of Robert Barr, and in the light of the above rules of construction, taking into account also "the relations and circumstances of the testator, of his estate, and of the objects of his bounty," determine whether it was his intention by his will to dispose of all the estate he might have. at the time of his death, or only of the estate he then had. He was in his eighty-third year, a widower, and childless. Calling to mind, at the outset in his will, the mortality of his body, and that it is appointed for all men once to die, he proceeds .to "ordain and leave" his last will and testament. "First and above all," he commits his soul to God, who gave it, and his body to the dust, from whence it came. "As touching what worldly things God, in his providence, has been pleased to bestow upon me," he wills and disposes of them as follows: To John, Robert, and Samuel Barr, children and heirs at law of his nephew, William Barr, who with their sisters had lived with and cared for him up to the time of his death, he gives "all and singular" his real estate. To John he gives his armchair and table and table-cloth and pots. All his other movable property he gives to Martha and Jane Barr, the sisters of John, Robert, and Samuel, who also lived with him and cared for him until his death. Looking to the language and the circumstances, we cannot doubt that he intended by that will to make an ultimate and final disposition of all the estate that he might have at the time of his death. But it is urged that he could not have intended to devise any interest in the lands involved in this suit, because, at the date of the execution of his will, Mary Jane Barr was yet alive, and no interest in those lands had vested in him. It may be assumed that he was wholly ignorant of the existence of either the will or the estate of William Barr, Sr., and that the idea of devising any interest in that estate never occurred to him; but the question is, did he intend by his will to dispose of all the estate of which he might die seised or possessed, or did he intend to die intestate as to any part of it? We think that the only proper construction is that he intended to make a final disposition of his entire estate which he might have at the time of his death. It is our opinion that when a testator devises "all and singular" his real estate, or makes a general devise by words of like import, his will, under the present law of Ohio or the law in force in 1816, speaks from the time of his death, unless the contrary intention appears in the will. This conclusion brings us to the third and last question to be considered.

3. Has an authenticated copy of the will of Robert Barr been admitted to record in the probate court of Hamilton county, as required by law? Upon the hearing, it was contended by counsel for Rob-

ert Barr that prior to the act of March 23, 1840, no such record was necessary. This proposition cannot be maintained, as clearly appears from sections 8 and 12 of the act of 1816. We adhere to the ruling made in this case (reported 47 Fed. Rep., at page 169) that the provisions of the present law have been substantially the law of Ohio since the year 1808.

At the former hearing the facts were not in dispute. Now it is denied that an order was made or entered admitting the copy of the will to record. Upon the testimony now before the court we find that the order was made in the latter part of January or early in February, 1884. S. T. Crawford prepared an order admitting the copy of the will to record. It was objected to as containing a finding that the will related to land in Hamilton county. Mr. Mannix prepared a short order, which was handed to Judge Matson, of the probate court; but it does not appear that it was entered. The testimony of William H. Sargent, clerk of the probate court, is that Judge Matson admitted the copy to record, and, objection being made to Mr. Crawford's draft of an order, Judge Matson authorized him (Sargent) to make the entry in the usual form. At first he stated that he could not remember putting the order on the minute book, having had, as he stated, 12 or 14 pages of minutes to make every day; but then he recalled that he had some conversation with Mr. Crawford in regard to the payment of costs, a matter with which, he testified, he would not have troubled himself if the record had been refused. Later in his deposition he testified that he used the "regular uniform entry." There is no evidence directly contradicting Sargent. It is shown that there is no record or statement in the Daily Law Bulletin of or about that date of the admission of a copy of said will to record, or of any action of the probate court thereon. The Law Bulletin was a daily publication of the transactions of the courts—including the probate court—of Hamilton county, Ohio. It was not the official paper of the courts, but was relied upon generally by members of the bar as an accurate and trustworthy chronicle of orders, entries, and judgments. There is other testimony of a negative character, but we are of opinion that the testimony of Sargent is entitled to the greater weight, partly under the rule of presumptions in favor of affirmative evidence, and partly because it makes the stronger impression upon our convictions. We conclude, therefore, that, although the copy itself of the will was not spread upon the record, it was in legal effect recorded, so as to make it effectual to pass the title to lands in Hamilton county. The reasons and authority for this conclusion are stated in McClaskey v. Barr, 47 Fed. Rep., at page 170. The case of King v. Kenny, there cited, is to be found in 4 Ohio Reports, instead of 4 Ohio State Reports, as there stated. The effect of the subsequent application to Judge Matson under section 5339b, Rev. St. Ohio, was considered in McClaskey v. Barr, 47 Fed. Rep., at page 170, and we are not disposed to reconsider it.

There is, however, another matter which it is necessary to look into. In September, 1887, a new application was made to the probate court by counsel for the heirs of the devisees of Robert

Barr to admit a copy of his will to record. To that a special plea was filed by the defendants in possession, setting up the prior application as a bar. The probate court declined to go into the merits of the application until the disposition of the special plea, which it heard and sustained. The case was then taken to the supreme court of the state, where the ruling upon the special plea was reversed, and the case remanded for further proceeding. Thereupon counsel for the Barr heirs obtained from Judge Ferris, of the probate court, who had at one time been an attorney in the proceeding to resist the recording of said copy of said will in said court, an order certifying the application to the common pleas court. Mr. Crawford, on the 29th of July, presented to Judge Evans, of that court, the order of certification, and an authenticated copy of the will of Robert Barr, with the original papers and the mandate of the court above. On the 30th of July, 1892, the court of common pleas found that the original will of Robert Barr was executed and proved in Pennsylvania according to the law of that state, and that it related to property in Hamilton county, and that it was duly authenticated; wherefore it was ordered that the copy of said will then presented should be admitted to record in the probate court, as provided by law in such cases; and that a certified copy of the entry should be made out, and, with all other papers and documents accompanying it, be transmitted to the probate court of Hamilton county, to enable that court to execute the order. On the 1st of August, 1892, a motion was filed in the court of common pleas to set aside the above entry, which in the mean time had been certified, and, with the papers, transmitted to the probate court. On the same day an entry was made by the court of common pleas staying the proceedings of July 30, 1892, and withholding the order then made to admit the record of the will of Robert Barr in the probate court, and ordering the papers to be returned with said order and with the copy of said will to the common pleas court, and withheld from entry and record in the probate court, to abide the further action of the court of common pleas. On the 5th of August the court of common pleas made an entry setting aside the order of July 30, 1892, and continuing the case to the October term, 1892. From that entry it appears that the papers had been returned to the common pleas court by the probate court before any action had been taken by that court in pursuance of the order of the common pleas court of August 1st; whereupon the court set aside the order of July 30th, and continued the case to the October term, 1892, for further proceedings. To all of this the counsel for the heirs of the devisees of Robert Barr excepted. The certification by the probate court to the common pleas court was under section 535 of the Revised Statutes of Ohio, which provides for such a certification in any matter in which the probate judge is interested as attorney or otherwise. The law requires that the probate judge—

"Certify the matters and proceedings to the court of common pleas, and he shall forthwith file with the clerk of the court of common pleas all original papers connected with the proceedings, and the same shall be proceeded in

and heard and determined by the court of common pleas, at chambers, by any judge thereof, or in open court, in the same manner as though that court had original jurisdiction of the subject-matter thereof; and upon the final decision of the questions involved in such proceedings, or on the final settlement of the estate in which the judge is interested as executor, administrator, or guardian, by the court of common pleas, or whenever the interest of the probate judge therein ceases, the clerk shall deliver all the original papers back to the probate court from which they came, and the clerk shall also make out an authenticated transcript of the orders, judgments, and proceedings of the court therein, and shall file the same in the probate court from which the papers came, and the judge thereof shall record the same in the ordinary records of similar business." See Rev. St. Ohio, p. 128.

This section gives to the court of common pleas, under the certificate of the probate judge, a limited and special jurisdiction to do precisely what is prescribed in the statute, and, when that is done, the jurisdiction of the common pleas court is at an end. The jurisdiction continues until the court acts and certifies its action back to the probate court. The moment that that certificate is made and the papers are transmitted back to the probate court, the jurisdiction of the common pleas court over the matter is terminated, and that court has no further authority or power. That certificate in this case was made by the court of common pleas on the 30th of July, 1892, whereby it sent back to the probate court its order admitting a copy of the will of Robert Barr to the records of that court. That order was not, and could not be, revoked by the subsequent proceedings in the common pleas court. Those proceedings were coram non judice. Edmiston v. Edmiston, 2 Ohio, 251; Heirs of Ludlow v. Johnston, 3 Ohio, 561. We are referred to U. S. v. Gomez, 23 How. 326, Cannon v. U. S., 118 U. S. 355, 6 Sup. Ct. Rep. 1064, and Peck v. Sanderson, 18 How. 42, where mandates were ordered back from the lower court to which they had been sent. But that was in the exercise of a general appellate jurisdiction over the case. Here there was neither appellate nor general jurisdiction, but only a delegated limited authority, under a statute, to do a particular thing in a case, the jurisdiction over which, excepting as to the doing of that particular thing, was exclusively in the probate court. The effect of the order of July 30, 1892, and its transmission to the probate court, was to make the will of Robert Barr effectual to pass title to lands in Hamilton county, even if there had been no previous order admitting it to record. Let the proper entry be made, including the defendants in the decree for partition herein.

JACKSON, Circuit Judge, concurs in this opinion.